Good morning, Your Honours. My name is Bernadette Willeke Connolly, and I'm appearing pro bono for the petitioner Mahmoud Daulat Shire. On appeal, we are addressing three questions. The first one was actually a jurisdictional question, which was raised by opposing counsel in their brief, where they assert that this Court does not have jurisdiction to review the determination by the immigration judge that my client did not show that he filed for asylum within one year of entry. And they cite, for this proposition, they cite Hakeem v. INS. And in that case, the Ninth Circuit actually did hold that this Court does not have jurisdiction to have to review an immigration judge's decision or a finding that he did not meet the one-year deadline. However, in this case, the immigration judge based his finding that our client my client did not meet the one-year deadline on his find of an adverse credibility finding. Therefore, it's distinguished from Hakeem, because in Mr. Hakeem's case, it was established that he had last entered the United States in December 1996 and only filed for appeal in July 1999. In this case, in my case, however, the adverse credibility finding is the reason why the judge said my client did not prove that he had filed within one year. Now, the central issue in this case is actually the immigration judge's finding that my client was not credible. And the first thing I would like to point out is that the bulk of the time spent in the hearing as well as in the immigration judge's decision is devoted to the manner of travel and the manner of entry. In other words, how did my client come from Kenya to the United States? He had fled from Somalia after his family was savagely attacked, his sister was raped, his brother was killed, his parents and himself were beaten, and his thumb was actually, for lack of a better word, hacked off by the attackers. So he left Somalia with the remaining family members, went to Kenya where he stayed about nine years, and then came to the United States. And basically, most of what the hearing was devoted to is how did he get from Kenya to the United States. And that is on this travel, the description of his travels is what the judge basically bases his finding of adverse credibility on. The first  thing I would like to point out is that the judge's finding was totally implausible, that Mr. Shiri could have traveled from Kenya with a passport that had a picture that looked like him but wasn't him. And he based his – the judge said that was totally implausible to him, and he based that finding on the testimony of a witness, an officer by the INS actually who testified that immigration officials very closely at the airport do look at the passports. Well, as we all know, and even the officer admitted, procedures outlined in the manuals for customs inspectors are not always followed. And we don't know the judge wasn't there, he wasn't at the airport, he doesn't know how closely the customs official looked at that. And it's not permissible under the case law of this – under the case law in this circuit that the judge bases an adverse credibility finding on his own conjecture with no evidence. Another point he raised was that my client traveled in the company of a young woman who smuggled him in, and they pretended to be husband and wife. My client testified that he was actually questioned together with his travel companion. Again, the judge said that was implausible. Well, that is his conjecture. He wasn't there, the officer wasn't there. How do we know what happened? So, again, he is – the judge is basing his findings on something that maybe he has experienced when he traveled. Maybe he was there for a session individually, but who knows? Maybe he never traveled with his wife. So we don't know what happened. And another, again, talking about the – There seems to be some dispute here about corroborating evidence, and I read the record about the problem of getting the documentation in on the deadline that the judge – that the immigration judge set. What can you tell us about that? Well, I can tell you actually a lot about that, because I represented him personally in those proceedings, and one thing that we all have to realize is deadlines are important. They really are important, and to the extent possible, practitioners try to meet them. What we are dealing with here is there was a problem, and we had two cases actually earlier where translation was a problem in court. Well, here there was a problem getting the letters translated on time and getting it in. And the record also reflects that the immigration judge in oral argument was told that those particular letters were retranslated after the client had submitted them translated, because there had been previously a problem where a client had submitted a translation that had been not correct. So, yes, there was – there was a deadline that was set. The deadline was not met. However, counsel at that time turned in a request for submission of additional documents stating that there would be no objections from Petitioner's side to continue the matter, to give the government time to examine the document. Why wasn't a request made for extension of time to get them in in the first place? Well, I think that was a stupid oversight that happened. It should not have happened. But, again, based on that, you know, the case law also said that evidence should not be excluded unless it would be fundamentally unfair. I believe, yes, missing a deadline is not good, and not to file a request for an extension is not good. But do we punish somebody with death for that? I mean, what we are talking about is the client was – What should we do? We should say that it's okay because the documents were important for the deadline to be missed, and that, therefore, it's permissible to reverse the immigration judge on the basis of a ruling that's his discretion or her discretion? Well, you have to look at the arguments advanced for the failure, and it was, given that the arguments were given, that there were practical problems to have the translation in. That means we're substituting our judgment for the immigration judge on rulings of matters of compliance with rules. Well, Your Honor, even – and we do not concede this point. However, even if we say, okay, the first batch of letters should not have been admitted, let's not forget that the judge opened a second window, filing window, and he then specifically instructed, and that's on page 240 of the administrative record, he specifically instructed that any information contained in the previously submitted letters could not be contained in there. And that is another issue that we have a problem with. And I think there is a fundamental violation of my client's due process right. Okay. One time we make a mistake, we take our punishment, they cannot be submitted. Fine. Now you open a second filing window and do not allow us to – to submit the evidence that we want. I think that is a due process violation and deprives my client of his right to submit the evidence that is critical to his case. Furthermore, the judge also substantially discredited the letters that then were submitted by Petitioner's father and his – and his wife. Well, I found that a little catch-22, I must admit. I'm sorry? I found that a bit of a catch-22 to be criticized for the letters not being specific when, in fact, the specific letters had just been excluded. Yes. And I was – I mean, frankly, I was fuming, but, I mean, that doesn't belong here, but in any event, you know. So the point is, then he said, okay, we have the letter from a third-world country by an illiterate person should look like. Again, that is – that was not right. Plus, then he said that in those two letters there was nothing that actually supported my client's claim for asylum, but specifically in the wife's letter, and that is on page 419, she said that there was nothing And then on page 426, it shows the stamp. It was May 3, 2000. She says, sweetie, speaking to her husband, we have not seen each other, basically paraphrasing now, we have not seen each other for a year. That establishes this one-year deadline. I see my time is up. If there are no more questions. Thank you. Thank you. All right. Chair, from the government. May it please the Court. Ann Toomai for the United States Attorney General. There are two conclusions this Court should reach. First, that the section INA 208A3 bars the jurisdiction to consider Mr. Shire's asylum claim. Secondly, that the record does not compel the conclusion that Mr. Shire established his higher burden of establishing eligibility for withholding with credible evidence. See, I'll be very frank with you. I have some trouble with the record in this case. It's one thing to enforce a rule on filing documentation, but then to write an opinion which says I find his claim not credible because he didn't present specific evidence, which is in the record, but it's only there. It's lodged and not received. Seems, as I put it earlier, a catch-22. So for the judge to, in effect, bolster his credibility finding by the absence of the very evidence that he's ruled out enforcing a filing rule seems to me a double-counting. So for him to say that I find this person incredible because he doesn't, notwithstanding his thumb's been cut off and a variety of other things, hasn't put in specific evidence doesn't seem fair, to put it simply. Yes, Your Honor. I recognize Your Honor's concern. This does relate to the second point the government is making in terms of his eligibility for withholding. A couple of things to address Your Honor's concern. First, as this Court stated in Wayne v. INS, which was issued last year, that in terms of an adverse credibility finding, as long as one of the bases for the adverse credibility finding is substantiated by or is supported by substantial evidence, then the Court is bound by the adverse credibility finding. In this case, we have a couple of different problems, and one of them that the judge cites to is the record. You know, the idea of what going through security was like pre-9-11 seems to me a reach in this case. This is a pre-9-11 case, wasn't it? Yes, Your Honor, but the problem is it's also relevant to his date of arrival in the U.S., which this Court has also stated in FARA v. Ashcroft, which came about after the government filed its brief in this case. In FARA, the Court said that the date of arrival or the date of entry in the U.S. is actually a critical element integral to a persecution claim. And in that regard, the means of the date of his arrival and as far as the inspection, that is relevant to his claim of arrival in the U.S. on May 25th, 1999. So it is relevant, and it is an aspect of the impossibility of the prosecution. I followed the argument. My point was at least the immigration judge seems to assume that he's not credible because of the inspection and the security would have had to go through overseas. Your Honor, this was what occurred, the inspections that occurred within the United States. That's the baggage mix-up, right? Yes, Your Honor. I thought that I.J. referred to the kind of inspection and process he would have had to go through before he got to the United States. Am I mistaken about that? Your Honor, my understanding is this is the inspections process when he's going through the United States and when he went to New York because his testimony was also that after his inspection was completed and there was some interpretation with his companion that they then left and there was some inconsistency there. But, again, we must consider the average credibility finding must be substantiated or upheld if there is at least one of the reasons that the I.J. provided. Okay. What's the strongest reason? Your Honor, I would say mostly the different implausibilities, one being the implausibility of his arrival date on May 25th when there is no record, absolutely no record, at least extrinsic evidence other than his questionable testimony that his arrival was within a year of his applying for asylum. We have extensive and numerous inquiries into the nonimmigrant information system database. We also have the British Airways investigation that Mr. Shire actually conducted, and there was nothing under any of the permutations of the names he alleged which would verify that his arrival date was as he alleged. Well, I have some general impression from post-9-11 information that the INS records are not perfect and that there's a lot of things that one would think ought to be available but aren't. Yes, Your Honor. But this was, again, as far as it was pre-9-11 in terms of the information that was inputted into the system in any event under the U.S.V. Red Top Mercury Mine case. My point is that post-9-11, going back and looking at the INS records, they're found to be incredible gaps and lapses and inability to track very key people that came out post-9-11 but with data that was entered pre-9-11. Yes, Your Honor. Even if that were the case, there's still a presumption of regularity as to what government officials do. And in that regard, then there's a presumption that there was information inputted as to when he arrived under any of the names that he might have alleged and there was no evidence there here. And then it's also implausible as to how he had been interviewed or had a conversation with the inspection officer when it's inconsistent with what Officer McCarthy, who has had five years of experience. It's not a matter of conjecture. His experience was in San Diego, right? Yes, Your Honor. And Lindbergh Field is a little different from JFK, right? Yes, Your Honor. But there is that information as well. And in addition to that, there is also the fact that it's impossible to have an individual who seems so at least that he can remember so many details of an event that occurred almost a decade ago. A traumatic event? Yes, Your Honor. That his thumb cut off? I bet he remembers that one. But the entire process would be very traumatizing. And it seems a bit implausible for someone who can remember down to the detail of what was stated over almost a decade ago and yet cannot or draws a blank, which is what he actually responded. He draws a blank on events that occurred less than a year prior to his testimony. There's also inconsistencies in the record. Is that what he said? He said he drew a blank? Yes, Your Honor. Or is that what the I.J. said? Your Honor, I'd have to review the record again. But, in effect, it was something along the lines where he cannot recall. And I'd have to look to see his testimony. But if I recall, it was something along those lines, that there was no information that he could not recall that. But then there's also inconsistencies to support the adverse credibility finding. We have his three different versions of what the United Somali Congress militiamen have stated to him and his family during the 1991 event. And then on top of it, he also has the inconsistent statements about whether or not he had gone through customs. He initially stated that he had only gone through immigration and then left the airport, and then afterwards he stated that he had gone through customs when confronted with the fact that customs isn't usually a process that he'd have to be going through. In addition, the immigration judge pointed out that his demeanor in the context of responses to queries related to the customs were insincere. In that regard, in terms of his eligibility for withholding, the Court must keep in mind the ---- Could you point to what the immigration said about that demeanor in specific? Your Honor ---- And the record is that. The demeanor was, I believe, pages somewhere along the lines of pages 40 to 44. If Your Honor looks at 40 to 44, I believe that is where the immigration judge had discussed his statements concerning the date of arrival. Now, where does it say about the demeanor? Your Honor, if I could have a moment, then I'll go take a look at the ---- I notice on page 43 it's the I.J. who says his mind is simply a blank. Yes, Your Honor. I don't think that was his words. I believe there was a quotation. The thing is, I couldn't find an actual description of what it was about the demeanor. Your Honor ---- You said it was because he looked insincere. So where is that? Your Honor, at the top of page 43, the I.J. and concluding about when assessing his claims as far as his arrival, I observed his physical demeanor on the witness stand when he spoke of this, referring to the customs officers and the inspection with the immigration officers. And I did not find him to be at all credible and sincere. As a whole, Your Honors, Shire has not satisfied his burden of proof. He has not shown evidence that compels a conclusion that is contrary to the board's adoption of the immigration's decision, immigration judge's decision. Here, he has upper testimony that is questionable. There are implausibilities, inconsistencies, demeanor problems. At best, he ---- and on top of that, he has not provided available corroborating evidence. We would also note that these events occurred almost a decade ago, and his family still apparently remains in Africa and Kenya or thereabouts. The evidence simply does not compel a conclusion that he has satisfied his higher burden of establishing withholding of removal with credible evidence. All right. Thank you. I thank both counsel. The case is now submitted for decision. The next case on the calendar is Zeng, Sheryl Lon Zeng v. Ashcroft. Thank you.
judges: T.G. Nelson, Tashima, Fisher